Argument is 16-2747 Ignite USA v. Camelbak Products We're still here, that's what matters. Good morning, may it please the court. I'd like to focus today on three points of error by the board below. First of those points of error is the board's errant construction of the term connected as set forth in the claims. Second, the board's unsupportable finding that the operating arm, which is item 52 in the Oosterling reference to refer to as Oosterling, is quote-unquote permanently connected. And three, the board's impermissible shifting of the burden to Ignite to disprove obviousness of claim seven of the 979 patent. I'll just point out for reference that the board's findings in this case were based on anticipation and obviousness. Only one claim was based on obviousness, that was claim seven. All the other challenge claims were based on anticipation. So let's talk about the term connected first. That term is found in all challenge claims and the claims specifically recite that the seal arm and trigger member are quote-unquote connected to the lid housing. The trigger member is called in claim 14 an actuator, just for the benefit of the court. And it's your argument that based on a description in a single embodiment in the specification that's sufficient to establish your definition contrary to the board? Ignite's position that the patentee was clear and unequivocal in stating that when the lid assembly goes from a cleaning position, excuse me, from a use position or operable position to a cleaning position, that the components of that lid assembly are connected in a fashion such that they cannot be disassociated from the lid assembly. And the reason for that is in column four. It does talk, it does address a preferred embodiment. That's the only embodiment that's disclosed in the application as it relates to the components of the lid assembly. And it's also- And your position is so that in the range of ordinary uses, which include filling, drinking, and cleaning, that it can't be dissociated or that in those ordinary uses it would not be. Which do you mean? That I would refer directly to the language in the claim, or excuse me, in the specification at column four, lines 35 through 45, that says that it cannot be disassociated or misplaced from the lid assembly. That it's connected at all times is other language that it describes. And it's talking about, in that section of the specification, it's talking about the lid assembly going from an operable, or use is what it describes there, from an operable position to a cleaning position. That's exactly what's in the claims as well. The seal arm in all the independent claims, challenge claims, goes from an operable position to a use position. And what we're talking about specifically, as it relates to connected, is the lid assembly and the components of the lid assembly. The board below pointed to the word connection as used in the patent specification. In the 406, okay, the examiner required that the claims be amended to replace and with while. Because he said and, doesn't mean it's always connected, right? The examiner asked for that particular substitution in the claim language. But IGNITE argued just the opposite. IGNITE argued that connected as used in the claims, submitted to the examiner, meant connected at all times, and cited the exact same language that's being cited through here. Camelback's counsel would say that estoppel would apply because of that supposed examiner's amendment. But IGNITE's not trying to argue a broader interpretation of something that it narrowed during the prosecution. In fact, the prosecution history shows they argued the exact same thing in prosecution that they're arguing now. The amendment that occurred in prosecution was to advance prosecution, but it did not improve the claims. The claims were consistent that... They said to the examiner in 406, we're going to change it to and, and we believe and means it's always connected. No, I don't believe they did not say that and is, excuse me, let me back up. They argued to the examiner that yes, that the claims as written that include the word and, that based on the word connected alone, that that meant connected at all times. The examiner made an errant, we'll just say that the examiner was errant in his interpretation as well, and said, I want when to replace and. But just because the examiner made that finding doesn't stop IGNITE from later saying, we said it's connected at all times, and the patentee was very clear and unequivocal in the patent specification that it's connected at all times. And we're now saying that it's connected at all times, consistent with what IGNITE has said during the entire prosecution of this patent. So it's not, it's not an, it's not an estoppel situation where the patentee is coming back later, has narrowed the claim language, and is now coming back later to broaden that claim language out beyond the scope of what it narrowed. It's, it's the exact same argument that was made to the examiner is being made now. And what's more important here is that the, the, the word connected and the parties agreed to this, and the, and the board found that the word connected is subject to varying degrees. And so IGNITE said, just like this court ruled in the Conega court case, that if you have a term like that, you've got to look to ascertain the meaning in the specification. And indeed, if you look in the specification, it says importantly. It uses the word importantly, and then refers to how the components of the lit assembly should be connected when that lit assembly goes from a use position to a cleaning position. So based on that very clear and unequivocal statement in the patent specification, the word connected should be construed to be consistent with that as it relates to those lit, lit components. We disagree with you about the construction, then anticipation goes away, right? If you agree with, with IGNITE. We disagree with you about construction. If you disagree about construction, then anticipation goes away. Yes, yes, I believe so. Yes. I'm sorry, because I thought you had the argument that the hook 43, the thing's still going to fall out. It is. So the, so the hook. Is that an argument that depends on your claim construction? I thought at least you made the assertion that you defeat anticipation even under the board's construction. Not even under the board's construction. The board's construction, if, if the board, if a non-permanent connection is, is, is a, is a proper construction, if connection, if connected is used with regard to those specific components of the lit assembly is a non-permanent connection, then Oosterling shows a non-permanent connection at hook 42 and opening 41. The board went further though and said, well, even if we say it's a permanent connection, hook 42 and 41 is a, is, is a permanent connection. And, and I'll turn to that now because that defies logic. You look at figure nine. Since time is limited, can you turn to claim seven? I sure can. Yes, yes. So in the petition. This is one in which Dr. Slocum in his initial declaration says something that might be described as at a fairly high level of generality. People would know how to do this. Yes. And then later on reply, he says, of course, here's how, and it gives a drawing. And the board says, I'm not going to rely on the latter thing. So I'm relying just on, on the generality in the first thing. That's right. I understand you say that's not what, why is, why is that wrong? Why is that wrong? Yes. Well, if you read the decision, it's very obvious that the burden of persuasion was, or the burden was placed onto IGNITE to come forward with evidence to rebut the assumption of obviousness. And the way that that's, the way that the decision can be read is that there's a double standard created here. The board says very specifically, obviousness, or I'll paraphrase, but basically the board says it's obvious because it's obvious and we're not going to tell you why. We're going to tell you why. The reason is just because generally speaking, you can make the change. And then it goes on to say that, that particular, the technical details of, of the, of the modification that would have to be made in New Scherling, that those don't even need to be provided, or are not necessary to this case. But then it goes on, and this is a double standard, it goes then on to fault IGNITE for not providing technical persuasive evidence to rebut modifications that were never even defined by the board or, or IGNITE, or excuse me, or Camelback. For example, the board faulted IGNITE for allegedly not providing technical reasoning to explain how the undisclosed modified spring would be ineffective to pivot 90 degrees due to impact with the side of the lid or opening. And on motivation, the board simply assumed that a person of ordinary skill in the art would have been motivated to alter the lever in New Scherling without first determining if Camelback's position was supported. And that turns the, the burden on its head. You know, IGNITE provided persuasive evidence showing that the modifications that were proposed, the, the just the broad statement of modifications that were proposed were incorrect, and that there was no, no support for motivation in this case. But the court should have put the burden on, on Camelback in the first instance to prove those, not just to accept blindly the conclusory allegations that were provided by Dr. Slocum and their expert. Um, did you file any papers subsequent to the reply declaration, the second declaration of Slocum in which he shows the, the, the, the bended, um, I don't know. Yes. It's called an arm or whatever it is. Instead of the check mark, he's got something that bends and curves around so that you can't push the whole thing through a relatively. Yes. Yes. We filed a very extensive motion to exclude those. We were not given an opportunity to file a sole reply. But we, we filed a motion to exclude that evidence based on the fact that one, it didn't comport with what he had, he had said. He said that you can. Right, right, right. That sort of depends on what you think the, whether the whole check mark or just the small piece of it is, is. Right, right. Did you provide an explanation for why what he finally drew in his second declaration wouldn't in fact, um, work or wouldn't, uh, yeah, wouldn't work? We, we, we didn't have an opportunity to provide such evidence, but we certainly, we certainly allowed, we, we got this in a, in a reply brief, this 18 page declaration in a reply brief. What steps did you do? I guess I'm asking two things. One is what steps you took and second, why wouldn't that obviously work? Why, for a myriad of reasons, uh, well, would it work? That, that, that's to be disputed. Um, would those modifications work? But is it hindsight reconstruction is, is I think a larger issue and one that we pointed out to the board in our motion to exclude, um, the, the location of the spring and, uh, without going too much into the details of, of, of exactly what was provided by Dr. Slocum, because again, the board didn't, didn't consider it. The board did not consider Dr. Slocum's expert, uh, supplemental expert declaration. But that expert declaration started off with the assumption that, okay, can I move this to make it go to 90 degrees? That's a hindsight reconstruction, um, uh, at, at its beginning, at its outset. The question is not. He started by saying personal skill in the art would think about how to improve cleaning, cleaning in, in dishwashers where there's water shooting around at a, at a high speed that can move things from one place to another. And then, um, and therefore would be motivated to try to solve that problem in kind of the same way you did, which is get the thing out of the way. And then a person of skill in the art would, would know how to do that. Now he, it would have been helpful to him had he said, um, in the first declaration, here's how, instead of saying everybody would know how to do that. Well, again, the, the, the evidence was, and, and Dr. Slocum testified that someone would already believe that the, the 30 degree angle that was provided in Oosterling was sufficient for cleaning. So there would be no motivation to open it up for additionally, for additional cleaning to a pasita. Second, he said that you may, you would open it up to, to move it to 90 degrees so that it didn't accidentally close in the dishwasher. Well, that's also refuted by Oosterling. Oosterling has a specific, um, latch mechanism on the lever that it's, that interferes fit, it's at the bottom of the V shape on, where the spring, uh, rises to the top that latches onto the side of the lid, um, and, and so that it doesn't accidentally move back to the operable position in a cleaning setting such as that. So again, that evidence shows that a pasita would not have been, um, interested in moving, uh, to 90 degrees based on this, this, uh, this idea that further opening would increase the cleanability. And even Dr. Slocum testified that if you, uh, that the snap fit is what would dictate some, the strength of the snap fit, and this is, this is what keeps it opening, and Oosterling would dictate whether or not that would close during cleaning, not the degree of opening in Oosterling. Okay. We're, you've exceeded your rebuttal. Why don't we hear from the other side, and we'll restore your minutes, if that's all right. Thank you. Maybe. Sorry. May it please the Court. I'd like to start with where we, where you just ended. Which is the obviousness argument on Claim 7. Dr. Slocum explained in his initial declaration why you would make this change, how you would make this change, and that it was simple. We're not talking about rocket science. You know, the, the words how, that he explained how you would make it, I, you know, if, if I were deciding whether to use those words to describe his first declaration, I would have a lot of pause about whether those were accurate words. I, I, I don't mean to say he explained specifically how you would modify each spring. He explained that you would modify this very simple spring mechanism, which is a molded plastic flat spring. He changed it from a, from a straight to a curved spring. That's what his subsequent drawing showed. Now, in terms of the evidence. But the Board specifically declined in footnote 11 to rely on the subsequent drawing. Because the Board felt and the Board believed, as it held, that we had met our burden of proof initially. It didn't need to go there. In, in explaining that we had provided sufficient proof, sufficient evidence to meet the preponderance standard, the Board said we don't need to consider this. I do want to point out that, that IGNITE had an opportunity to take a second deposition of Dr. Slocum. They had an opportunity, they made motions to exclude, they made. That was after the second declaration. After the second declaration, we got together again for a subsequent deposition. Both are included in the appendix. They made arguments to exclude. They made arguments to challenge Dr. Slocum's qualifications. Those were rejected. There was argument at oral argument. The transcript of the argument is here. They've had an opportunity. And then, when the panel, when the Board came down with its final written decision, IGNITE then again went and said, you either misapprehended or ignored our evidence. And you improperly did this. And the Board said, no, we didn't. We considered your evidence. We just found it unpersuasive. And the reason that it was, the technical evidence they presented was unpersuasive, because it didn't address the kinds of changes that Dr. Slocum had described. Yes, in somewhat general terms, a change to the size or shape of the spring. They simply adjusted one factor, and they set it up for failure. And Mr. Steininger could not fathom how this could be done, which is what led Dr. Slocum to provide a very detailed explanation of the steps he would take to do this. As for hindsight reconstruction, this notion, at any time we're doing this analysis in a case like this, it's always hindsight reconstruction, because we're trying to put ourselves into the shoes of what an artisan would have known at the relevant time period. In this case, 2011. So Mr. Moreland made the point that in oocylene itself, there is a mechanism, I'm not quite sure which of the figure numbers is, for preventing the high-speed water in the cat. So why would anybody go look for a different way of solving that problem? It's perfectly solved there. Two reasons. There were two problems to be solved, and I would say you improve the solution by eliminating the potential great forces of water from actually pushing through the interference film. Remember, this is the same, their same expert testified. Do you happen to know, or have, I guess I'm looking at figure nine, which everybody seems to be using. I'm assuming 783 of the appendix is figure nine. I do have it. I think that's the figure everybody feels. So which piece of that structure prevents the water from closing? I think the assertion is that once the, my eyes are not very good, the opening at 34, where the tip at 47 hits, I think is the assertion that that provides an interference fit that would prevent it from, once it snaps through, from going back through. And the point being that this is the same, their assertion is that these interference fits are so light that you could expect 42 to fall out of 41, but not this. So if you're worried about interference fits or a fit that's designed to go back and forth, you would be interested in designing a device that would be more propped open so it would lessen the opportunity for it to go, to push closed. Secondly, Dr. Slocum also testified in declaration that this also provided additional manual cleaning access to the lever in case, I think he used the phrase, it was extra goopy, by having greater access to the insides with a wider opening. So there were two problems being solved by the larger opening. So what was the board doing saying some extremely large number of times about their evidence? We are not persuaded. We are not persuaded. We are not persuaded. I mean, isn't that just, doesn't that tempt a reviewing court to say, what are you doing? You seem to be shifting the burden of persuasion. I don't think they're shifting the burden of persuasion. They're saying, you've met our initial burden. You've said we believe your evidence. We believe you've established it. Now, what do you say about that Ignite, that we should disbelieve that evidence that's been presented? So they presented evidence that the board simply found unpersuasive. And finding it unpersuasive doesn't mean they've shifted the burden of proof. It simply means that they've considered the totality of the evidence. They didn't misapprehend the evidence, and they found it either not credible, or they found that it was not responsive to the point that was being made. So for instance, only adjusting one dimension when, and in doing so in a way that's designed to fail, isn't responsive to a simple change to the shape of the spring. Dr. Slocum demonstrated that after the fact. But they didn't need to, because they found that the initial response, the evidence offered, didn't meet the question presented. And because it didn't meet the question presented, it was unpersuasive. And because Mr. Steininger couldn't fathom a way to do this, it was unpersuasive. And it's fine to say it's unpersuasive. That's how you assess the evidence. Whether our evidence was persuasive, their evidence was unpersuasive, that's the phrasing. And the board clearly held that we had met the preponderance of the evidence standard. They did so in the written decision, and they did so again in the denial of rehearing. And so to second-guess them and say they were holding them to a different standard, I think, is inappropriate here. Because they said what they were doing, and they said they agreed with the reasoning and found our reasoning and evidence persuasive. And they found their reasoning and argument and evidence unpersuasive. That's what courts and fact-finders and arbiters do every day when they assess evidence. With respect to connected, I don't do this often. But the estoppel argument, I think, is important. Because Festo deals with this argument. And it says quite clearly, and I'm reading in the Supreme Court reporter version at 1840, it says, estoppel arises when an amendment is made to secure the patent, and the amendment narrows the patent scope. The amendment in the parent application was made to obtain the patent. Mr. Moreland admitted it was not. I'm sorry. And so Festo was about prosecution history, estoppel. Yes. A bar to doctrinal equivalence infringement. What's the relevance of that? It was a bar to recapturing material given away. Through, well, no. It was a bar specifically to recapturing it through the doctrine of equivalence. Yes. Quite a different thing. It is quite a different thing. But it's a bar to recapturing material that you've given away. And that's the broader proposition of Festo, I believe. Because that's the language that I just read as a direct quote from the Supreme Court. And what they did here is they amended. Which was not about claim construction. It was not about claim. And we have, on a number of occasions, made clear for, I think, reasons that are pretty themselves clear that figuring out whether there was an estoppel, or I guess in the claim construction context, we call it a disclaimer, is not quite the same question and is subject to a different standard than prosecution history estoppel, which you presume from having made an amendment. And one of the reasons you can presume it is that you can, in fact, go and get a new claim in a continuation application on the very same material. Because at that point, it's literal infringement and not equivalence infringement. But what we're referring to here, and I want to be very clear, the examiner gave them a notice of rejection based on the prior art. Because they said connected and movable. Because he said, if you want it to be connected while movable, you have to say connected while movable. And they did. They could have chosen to stand on their prior claim language and appeal the rejection. We're right, you're wrong. But they didn't. They proceeded and obtained a patent on the basis of an amendment that was made to, and in the circumstance, that gives rise to an estoppel. Which is just another reason why they shouldn't be permitted to come back now and argue that connected and movable means connected at all times and non-removable. I think the court pointed out earlier, but this is one embodiment. One of more than 30 cases in which they say, in an embodiment. And they describe this. But they don't use the phrase in a clear and precise way that tells you that every time we use the word connected, we mean permanent and non-removable. And there are a number of times they use connected in the patent that clearly are not permanent. And so they're asking you to adopt a claim construction that means permanent and non-removable in one case, but not in another. So for instance, the trigger member is connected to the seal arm. Well, if that's a permanent connection, there could never be a cleaning position. Because it would always be permanently connected. The lid is connected to the container. If that's a permanent connection, this product can't work. We need to take the lid off in order to introduce liquid to the container. The board's construction was entirely appropriate using the broadest reasonable construction standard. It encompasses all the embodiments, including the preferred embodiment. If this is their preferred embodiment, it still includes it. It doesn't exclude anything. It says it's connected. And the board concluded appropriately that it includes both permanent and non-permanent connections. But even if you agree that it includes something more, there is the argument, and the board specifically found, that Oosterling discloses a permanent connection. There is no evidence in Oosterling that the operating arm falls out, that the trigger member falls out. The sole evidence they relied on at the board was their review, their expert's review of the drawing to find, based on a specification, that it would slip out and fall out once it was taken off the lid. And as the court knows, that's not a proper use of the patent drawings. Where no dimensions are provided. And that's what they were trying to do. I see enough space, so this thing will fall out. And because that was their sole basis, and the board discounted that, there is no, there can be no reasonable dispute that, in fact, we have a device in Oosterling that shows the operating arm connected in the cleaning position, as shown in Figure 9. And with that, unless the court has further questions. Thank you. Quickly address, so we know that the board was operating under a presumption of shifting the burden at the time that this decision was rendered. This is pre-Magnum Oil, and it's at a time when the PTO was saying, we are doing this, we are shifting the burden. Anecdotally, one of the board members that was on our case was on the Magnum Oil case. So, we know that this is what they were doing. You read the decision, it's very evident that that, they were putting the burden on IGNITE to come forward with evidence. And it's important because if you look at the evidence, if the board had actually done, had applied the burdens correctly, it would have looked at the evidence that Ken Wolbach had submitted and found that there was no, yes. What are you referring to? And forgive me if I'm just not remembering, but should, by pre-Magnum Oil statement by the PTO or the board or somebody, this is what they were doing? Yes. So, in Magnum Oil tools, which came out, which was a decision by the court after the final decision was rendered in this case, the PTO was arguing for the adoption of a burden shift, essentially, in Magnum Oil tools. And was saying that that was the proper, that that should be proper, that shifting the burden to come to the patent owner to come forward with evidence after the institution decision is the proper mechanics for the trial process because it simplifies it, I suppose, was the reason. But that wouldn't actually be a shift in the burden of persuasion. It was, right, it was of the going forward. And of course, this court said, no, you don't shift any burdens in this process. But they were operating under that. That was a modus operandi, essentially. It was an admission made by the PTO. This is what we're doing. And this is before that decision came out. So we know that they had not been corrected, if you will. But again, it makes a difference because if the board had looked at the evidence, it would have come to the conclusion, it's conclusory. And again, under Magnum Oil tools, conclusory evidence wouldn't be sufficient to satisfy the burden of persuasion that is on the petitioner in this case. It looks like I'm out of time. I've got a couple of other points, but I think we've heard it. OK. All right. Thank you.